OPINION OF THE COURT
Norman C. Ryp, J.
A, ISSUES
1. Whether an acquaintance rape victim is entitled to punitive damages in a civil suit against the criminally convicted perpetrator? A contested issue of first impression.
2. Whether the 1991 amendment to the Civil Rights Law (§§ 50-b, 50-c), effective July 31, 1991, which requires confidentiality of the identity of a sex victim and bars disclosure by a public officer or employee, applies to a civil action commenced in 1989? An uncontested issue of first impression.
B. PROCEDURAL HISTORY & FACTS
In this original Supreme Court, New York County, action (index No. 1039/88) to recover $10,000,000 in damages for intentional sexual assault, battery, and infliction of emotional distress, summary judgment was granted to plaintiff on the issue of liability only by order of Justice Eugene L. Nardelli, LA Part 2, dated September 27, 1988. This was based upon defendant’s felony convictions on November 18, 1987, in Supreme Court, New York County (docket No. 4830/87 in LA Part 59), of rape, sodomy and sexual abuse, all in the first degree, and concurrent sentence of 3 to 9 years in a New York State correctional facility by Justice Thomas B. Gallaghan. Subsequently, the matter was transferred to this court for an assessment of damages by Justice Nardelli, pursuant to order, dated August 3, 1989. Plaintiff, who commenced this civil action, has not requested anonymity and neither party has applied for this file to be sealed. However, the 1991 amendment to Civil Rights Law § 50-b (expands confidentiality to all victims of sex offenses, regardless of age) and newly enacted section 50-c therein (private right of action for unauthorized disclosure) may apply. (L 1991, ch 251, eff July 31, 1991.) Thus, for the reasons set forth below, in the interest of justice and protection of plaintiff’s privacy, this court will seal the court file herein and omit plaintiff’s surname and residence address, unless plaintiff, in writing, chooses otherwise.
*710 C. ASSESSMENT OF DAMAGES
Thereafter, this matter was heard pursuant to an order of this court, dated December 7,1989, to produce defendant, then incarcerated in the New York State Washington Correctional Facility, at Comstock, New York, on December 7 and 11, 1989. At the assessment of damages hearing, both plaintiff and defendant testified, setting up a "her” versus "his” credibility test. Final submissions were made in August 1991. The testimony was rapid-fire and rarely chronological. This court’s summary and findings are based upon its notes and not a trial transcript.*
(c) Punitive Damages
The United States Supreme Court has recently held that the common-law method for the trier of fact to assess punitive, in addition to compensatory, damages predates and does not violate the Due Process Clause of the 14th Amendment of the US Constitution (Pacific Mut. Life Ins. Co. v Haslip, 499 US —, 111 S Ct 1032 [1991]).
In New York, punitive damages are generally confined to unusual cases exhibiting malice, fraud, oppression, insult, wantonness or other aggravated factors which effect a public interest (Walker v Sheldon, 10 NY2d 401 [1961] [gross fraud and deceit]; Le Mistral v Columbia Broadcasting Sys., 61 AD2d 491, 494 [1st Dept 1978] [reckless disregard of rights and warning to others]). Punitive damages have been allowed in the case of a private wrong (Borkowski v Borkowski, 39 NY2d 982 [1976] [fraudulent deed to mother, moral culpability]). Recently, the New York Court of Appeals upheld a punitive damage award resulting from the fraudulent sale of stock in a closed corporation finding defendant’s conduct a willful, wanton disregard of the rights of fellow shareholders and a breach of fiduciary duty (Giblin v Murphy, 73 NY2d 769, 772 [1988]; see also, Cohen v Hallmark Cards, 45 NY2d 493 [1978] [right of privacy]; Nardelli v Stamberg, 44 NY2d 500, 503 [1978] [malicious prosecution]).
The main purpose of punitive damages is to punish the defendant and deter others from acting in a similar manner so as to protect society. (Walker v Sheldon, supra; Hartford *711 Acc. & Indem. Co. v Village of Hempstead, 48 NY2d 218, 224 [1979]; Restatement [Second] of Torts § 908.)
Except as provided by statute, there is no formula by which punitive damages are fixed. Whether to award punitive damages in a particular case, as well as the amount of such damages, if any, are primarily questions which reside in the sound discretion of the original trier of the facts. (Walker v Sheldon, 10 NY2d, supra, at 405; Nardelli v Stamberg, 44 NY2d, supra, at 503.)
If punitive damages are awarded, the court may consider defendant’s financial assets or wealth. (Ruppert v Sellers, 48 AD2d 265, 268-272 [4th Dept 1975], 65 AD2d 473 [4th Dept 1978], affd 50 NY2d 881 [1980], cert denied 449 US 901 [1981].)
The Appellate Division, Second Department, affirmed by the New York Court of Appeals has held that an award of punitive damages must be based on " ' "quasi-criminal conduct” or [of such] utterly reckless behavior’ or demonstrated 'malicious intent’ to injure the plaintiff, or gross, wanton or willful fraud or other morally culpable conduct.” (Laurie Marie M. v Jeffrey T. M., 159 AD2d 52, 58 [2d Dept 1990] [intrafamilial child sexual abuse], affd 77 NY2d 981 [1991].) This case expanded punitive damages in civil sexual abuse cases to include betrayal of a child’s trust by a close family member, from previous cases that involved betrayal of a professional relationship involving a public trust or authority, i.e., psychiatrist-patient (Roy v Hartogs, 81 Misc 2d 350), dentist-patient (Public Serv. Mut. Ins. Co. v Goldfarb, 53 NY2d 392) and teacher-student (Micari v Mann, 126 Misc 2d 422).
In Boorman v Deutsch, after a remand to reassess as excessive compensatory and punitive damages of $5,000,000 awarded upon default (152 AD2d 48, 55 [1st Dept 1989]), a second inquest or assessment of damages was held on August 13, 1990 in Supreme Court, New York County (index No. 29609/84), in iA Part 2, before Justice Eugene L. Nardelli. Justice Nardelli thereafter awarded $1,000,000 past compensatory damages; $750,000 future compensatory damages plus $1,000,000 punitive damages for sexual and aggravated assault over an evening and a night for which defendant was convicted of two felonies in New Jersey, following testimony by plaintiff and a psychologist. The plaintiff and defendant had renewed a prior social and sexual dating relationship which turned violent.
Similarly, in the case at bar, defendant was found herein, *712 by summary judgment granted, liable for intentional infliction of emotional distress and such findings may also be the predicate for compensatory and punitive damages. (See, Nardelli v Stamberg, supra.)
In addition defendant’s conduct herein was the basis for criminal convictions of three violent felonies (rape, sodomy and sexual assault all in the first degree — Penal Law §§ 130.35, 130,50, 130.65). Thus, the criminal or quasi-conduct or such utterly reckless behavior standard set in Public Serv. Mut. Ins. Co. v Goldfarb (53 NY2d 392 [1981], supra) and Maitrejean v Levon Props. Corp. (87 AD2d 605 [2d Dept 1982]) has been met.
Defendant’s conduct, in compelling sexual intercourse, sodomy by the admitted use of a knife, implicit or explicit threats of violence and cutting of plaintiff and her clothing are reprehensible, whatever the subject mitigating circumstances which this court finds, in fact and law, quite incredible and plaintiff’s version substantially credible. No one for a moment much less hours has the right to forcibly attack, intrude upon and injure the personal, emotional, psychic, sexual and physical dignity and integrity of any other human being, however naive, foolish or even sexually provocative in behavior or suggestion. A clear "No!”, by words and/or acts, must be accepted as "No!” in a democratic and lawful country. It is a nuclear part of every person’s inalienable rights to life, liberty and the pursuit of happiness articulated in the American Declaration of Independence, adopted July 4, 1776, by the Representatives of the 13 Colonies, that became the basis of these United States of America, at the birth of this country. It is the core of any civilized society or democracy, under due process of law so that its violation cannot be tolerated by a court of law.
(d) Date or Acquaintance Rape
The betrayal of a person’s trust by a friend or acquaintance or date who professes intimate care, cannot accept "no” for an answer to sexual advances and suddenly turns savage, may be no less reprehensible, under certain circumstances than betrayal of a child’s trust by a close family member (Laurie Marie M. v Jeffrey T. M., supra), or a public trust by a psychiatrist (Roy v Hartogs, supra), teacher (Micari v Mann, supra) or dentist (Public Serv. Mut. Ins. Co. v Goldfarb, supra). The rising known tide of physically or emotionally forced sexual intercourse by a previously known friend is now called *713 date or acquaintance rape. Its earliest known origin is over 3,500 years ago, recorded in the Book of Exodus in the social acquaintance rape of Dinah by Shechem (Genesis 34:2). In the 20th century, it is first mentioned in Against Our Will: Men, Women and Rape by Susan Brownmiller (Bantam Books 1977) and then initially chronicled by former Harvard (now University of Southern California) Law School Professor Susan Est-rich in Date Rape (Harvard Univ Press 1987) noting (at 12) that in three separate studies of college students in 1985, 20% reported being physically forced to have sexual intercourse by her date, yet the majority did not feel they had been raped. The most comprehensive and focused study was the Ms. Report on Recognizing Fighting, and Surviving Date and Acquaintance Rape entitled I Never Called It Rape by Robin Warshaw (Harper & Row 1988).
The criminal trials of William K. Smith (accused and later acquitted on December 12, 1991, of raping an acquaintance during the 1991 spring holiday break at the Kennedy family compound in Palm Beach, Florida) and that of former world heavyweight boxing champion, Mike Tyson (accused and convicted, on February 10, 1992, of raping a Miss Black America Beauty Pageant contestant date) have both heightened interest in research in date or acquaintance rape and their trauma and credibility problems.
A recent article in the Science Times section of the New York Times indicated that "In years past rape was seen as the expression of an overwhelming sexual urge, one that women could invite by provocative dress or behavior; more recently it has been widely described as simple violence against women, expressed through sex. * * * The new research suggests that only a small minority of rapists are sexual renegades driven by sadistic fantasies or hatred of women, and that far more common are men with a normal sexual orientation who rape impulsively as the opportunity presents itself, often while on a date.” (Goleman, New Studies Map the Mind of the Rapist, New York Times, Dec. 10,1991, at C-l, 10.)
According to the F.B.I. Uniform Crime Report 1988 National Crime Survey, United States Department of Justice, the F.B.I. received reports in 1988, that 92,486 women over the age of 12 were raped in 1988, with the estimated actual number 200,000 to 900,000 and an estimated 60% to 80% committed by an acquaintance or date. This increased violence against women, especially rape, led to hearings by a United States Senate Committee chaired by Senator Joseph R. Biden, *714 Jr., who on June 19, 1990, and amended January 14, and October 3, 1991 introduced the proposed Violence Against Women Act of 1990 and 1991 (S2754, 101st Cong, 2d Sess, as amended by S15, 102d Cong, 1st Sess) now pending in the United States Congress. These proposed bills would double Federal penalties for rape, require mandatory restitution to the victim, provide a civil rights remedy for victims of gender-based crimes and establish a national commission to study violent crime against women.
The term "date or acquaintance” rape is a term that identifies nonconsensual sex between dates or acquaintances as a form of male assault rather than female error, according to a special report by William Celis 3d entitled Agony on Campus: What is Rape? on the front page of the New York Times (Jan. 2, 1991, at 1, cols 5-6, at B-8, cols 1-6). It is distinguished from: incest, authority rape (doctors and teachers), spousal rapes and children under 14. (Warshaw, I Never Called It Rape, op. cit.) Its first mention was in a 1976 landmark book by Susan Brownmiller that raised America’s consciousness about rape called Against Our Will: Men, Women and Rape. According to Ms. Brownmiller in 1976, women raped by young men they knew did not understand this was an actionable offense but "felt she had done something wrong.” The New York Times special report points out the change in women’s attitudes from "you put yourself in a vulnerable position and its your own fault” to the need for reacting more quickly and education of both women and men that "no” means "no!” not "no?” Many men have been conditioned to believe that initial refusals are an essential part of the "mating game” ritual which dictates that women must resist somewhat to make themselves more attractive to men and assumes that certain behavior like going alone to the man’s room or house, kissing or heavy petting are automatic precursors to sexual intercourse and not rape.
This rising tide of date or acquaintance rape confirms that such rape, especially where threats or a weapon is used, is violence, not uncontrolled sexual drive, used by a man to overpower and enslave another person, a woman (in most cases) or a man (in a few cases), against their will. This violation of a human being is "of the most personal, most intimate and most offensive kind” (Estrich, Date Rape, op. cit., at 104), must be condemned and deterred by courts and Judges not only in the criminal but also in the civil justice system. Victims, such as plaintiff, who "come out” and risk *715 privacy and dignity in the face of an ambivalent public and recidivism deserve judicial support for their courage and public service to fellow victims. This violence against women by dates or acquaintances who had a prior close intimate or friendly social relationship causes incalculable injury to society as well as private interests (see, Laurie Marie M. v Jeffrey T. M., supra [an intrafamilial sex abuse case]). This violence, fear, betrayal and abuse unless deterred can perpetuate terrible personal injury to society into the 21st century. Thus, this court finds in fact and law that the deterrent value of punitive damages is vital and that defendant’s conduct warrants the drastic sanction of punitive damages.
3. Damage Awards
(a) Compensatory Damage Award
Compensatory damages recoverable for sexual assault, battery and intentional infliction of mental distress include compensation for the injury itself, conscious pain and suffering including mental and emotional anxiety which can be based on the plaintiffs subjective testimony plus special damages, which need not be pleaded. (Laurie Marie M. v Jeffrey T. M., supra; De La Cruz v City of New York, 163 AD2d 163 [1st Dept 1990].)
It is very difficult and nearly impossible to quantify in a dollar amount the extreme trauma of any rape experience, including date or acquaintance, usually a "power rape” according to psychologist, Nicholas Groth, Director of Forensic Mental Health Association. According to plaintiffs testimony, after normal social interaction in her apartment, she was suddenly grabbed and, upon refusal and resistance, she was threatened verbally and with a knife (used in 44% of all weapon rapes — according to 1989 United States Bureau of Justice Statistics), having a 4- to 5-inch blade, with being, and was, cut, a particular horror to a model, and killed unless she submitted to forced sexual intercourse for 1 to 2 hours. The social and emotional betrayal and humiliation, the isolation, the threat and violation to her self-esteem, physical, psychic and emotional integrity and health, the fear for her life, the utter sense of hopelessness and helplessness, loss of income and therapeutic and medical expenses are among the many factors this court must consider and evaluate in assessing compensatory damages for the incident and a reasonable time thereafter. Unfortunately, plaintiff did not present any expert witness or evidence, so this court, under the rules of evidence, *716 is limited in awarding any compensation for future (posttrial) pain and suffering and special damages. After thorough consideration of all competent evidence presented by plaintiff and defendant, this court finds, in fact and law, that plaintiff sustained $70,000 in special damages ($1,995 medical care bill plus $68,500 loss of income) is entitled to $100,000 for the incident plus pain and suffering, totaling $170,495 in compensatory damages.
(b) Punitive Damage Award
In determining the amount of punitive damages, the trier of fact may properly consider all the facts and circumstances immediately connected with the incident tending to exhibit or explain: defendant’s motive; the existence or absence of malice or intentional disregard for plaintiff’s rights or reckless indifference thereto, the nature, quality and duration of harm inflicted upon plaintiff, defendant’s financial wealth or assets and the degree of deterrent resulting from a punitive award. (Le Mistral v Columbia Broadcasting Sys., 61 AD2d, supra, at 494-495; Levine v Abergel, 127 AD2d 822, 825; Restatement [Second] of Torts § 908, comment e.)
In this case, defendant was convicted for his criminal behavior and, admittedly his sudden Dr. Jekyll-Mr. Hyde transformation upon being sexually rebuffed from a gentle person to a raging animal showed utter reckless behavior and his threatened and actual use of a sharp knife upon plaintiff’s person, necessitating medical and psychological treatment, demonstrated "malicious intent” to injure plaintiff (Maitrejean v Levon Props. Corp., 87 AD2d 605, supra). Clearly, this warrants civil punishment through punitive damages "to send a message” to deter others from similar conduct against women (Hartford Acc. & Indem. Co. v Village of Hempstead, 48 NY2d, supra, at 226). This punitive award is " 'to serve as a warning to others’ ” and " 'as punishment for gross misbehavior for the good of the public’ ”. (Toomey v Farley, 2 NY2d 71, 83 [1956]). Though defendant did not directly prove his financial circumstances warranted a limitation of a punitive damages award (Rupert v Sellers, 48 AD2d, supra, at 268-272) no evidence was presented to show that defendant, stepchild who was employed, before his arrest, as a realty manager and rent collector and the father of a two-year-old child out of wedlock, is not a wealthy man. Under all of the foregoing facts and circumstances, this court finds, in fact and law, that a punitive damage award of $200,000 is fair and reasonable.
*717 ■ 4. Plaintiffs Identity & Court File Access
Normally when a person sues in a civil action, even for personal injuries arising out of sexual abuse, such plaintiff, though an infant, waives any claim for confidentiality. (See, Matter of Radio City Music Hall Prods., 126 Misc 2d 197, 198 [Sup Ct, NY County 1984], affd 121 AD2d 230 [1st Dept 1986].)
However, effective July 31, 1991, following subject inquest, Civil Rights Law § 50-b (victims’ identification) was amended to include adults and a new section 50-c added, to include a private cause of action. (L 1991, ch 251, §§ 1, 2, eff July 31, 1991.)
This legislation, relevantly provides, as follows:
"§ 50-b. Right of privacy; victims of sex offenses
"1. The identity of any victim of a sex offense, as defined in article one hundred thirty or section 255.25 of the penal law, shall be confidential. No report, paper, picture, photograph, court file or other documents, in the custody or possession of any public officer or employee, which identifies such victim shall be made available for public inspection. No such public officer or employee shall disclose any portion of any police report, court file, or other document, which tends to identify such victim except as provided in subdivision two of this section.
"2. The provisions of subdivision one of this section shall not be construed to prohibit disclosure of information to:
"a. Any person charged with the commission of a sex offense, as defined in subdivision one of this section, against the same victim; the counsel * * * of such person; the public officers and employees charged with the duty of investigating, prosecuting, keeping records relating to the offense, or any other act when done pursuant to the lawful discharge of their duties; and any necessary witnesses for either party; or
"b. Any person who, upon application to a court having jurisdiction over the alleged sex offense, demonstrates to the satisfaction of the court that good cause exists for disclosure to that person. Such application shall be made upon notice to the victim or other person legally responsible for the care of the victim, and public officer or employee charged with the duty of prosecuting the offense; or
"c. Any person or agency, upon written consent of the victim or other person legally responsible for the care of the victim, except as may be otherwise required or provided by the order of a court.
*718 "2. The Civil Rights Law is amended by adding a new section 50-c to read as follows:
"§ 50-c. Private right of action
"If the identity of the victim of a sex offense is disclosed in violation of section fifty-b of this article, any person injured by such disclosure may bring an action to recover damages suffered by reason of such wrongful disclosure. In any action brought under this section, the court may award reasonable attorney’s fees to a prevailing plaintiff.”
Upon approving the above legislation, on July 1, 1991, the New York Governor, Mario M. Cuomo, stated in his Governor’s Memorandum, as follows:
"The bill adds a new section 50-c to the Civil Rights Law creating a private right of action in favor of a sexual offense victim who is injured due to the disclosure of his or her identity by a public employee or officer. Except under tightly limited circumstances, section 50-b of the Civil Rights Law bars public officials from disclosing the identity of a sexual offense victim, but its shield currently attaches only to victims under the age of 18 at the time of the alleged commission of the sexual offense and no express sanction is provided for a violation of its terms. The bill effectively recognizes that adult victims are also deserving of such protection and supplies a deterrent against unauthorized disclosure by establishing a statutory cause of action for those injured by an unauthorized disclosure.
"Rape, incest and sexual assault victims have unfortunately had to endure a terrible invasion of their physical privacy. They have a right to expect that this violation will not be compounded by a further invasion of their privacy. All too often identifying the victim results in a public recounting of the details of the crime.
"The release of such identifying information does not serve the interest of justice. Indeed, it does a gross disservice to both the victim and the public. Concerns pertaining to privacy sometimes result in a victim failing to report a sexual offense. In its final report, the Governor’s Task Force on Rape and Sexual Assault documented that sexual offenses are vastly underreported. Undoubtedly, there is even less incentive for a victim to report the sexual assault if his or her identity may become public.
"Media accounts of sexual offenses, including reports of the victim’s identity, are not affected by the bill as the new right *719 of action only attaches to violations of section 50-b which, by its terms, applies solely to public officials. While this bill is not designed to have an effect on the media, it will be an important safeguard for the privacy of sexual offense victims.
"The bill is approved.” (1991 McKinney’s Sessions Laws of NY, at 2211-2212.)
A statutory analysis of the foregoing reveals the following:
(1) The mandatory word "shall” is used in Civil Rights Law § 50-b (1), while the discretionary "may” is not stated at all. While not definitive, it reflects the legislative intent, its underlying purpose and public policy promoted, as shown by the above Governor’s Memorandum of Approval and Governor’s Bill Jacket for S5240/1991. (See, McKinney’s Cons Laws of NY, Book 1, Statutes §§ 171, 172; Matter of Rhodes v Salerno, 90 AD2d 587 [3d Dept 1982], affd 57 NY2d 885 [1982].)
(2) While there are references in both the above statute and the Governor’s Memorandum of Approval to "sex offenses” and "sexual offenses” as well as "criminal proceeding”, only once in subdivision (4) (court not required to exclude public), there is no explicit limitation on nor excusive application to the criminal justice system.
(3) The same legislative rationale, including, but not limited to: terrible invasion of physical and very personal privacy, with victim’s recounting of the trauma; public assault upon the victim’s dignity; and the resulting underreporting of sex offenses and sexual abuse applies equally to a civil action as well as to a criminal proceeding.
(4) The victim’s identity can be obtained by: the person charged with the sex offense (subd [2] [a]); the prior written consent of the victim or person legally responsible for victim’s care (subd [2] [c]); while disclosure of other attendant facts can be obtained by prior application to the court having jurisdiction, upon good cause and prior notice to the victim (subd [2] M).
(5) The only published case to apply Civil Rights Law § 50-b (pre-1991 version applicable only to victims under 18) is Matter of Radio City Music Hall Prods. (126 Misc 2d 197, 198 [Sup Ct, NY County 1984], affd 121 AD2d 230 [1st Dept 1986], supra). Though Supreme Court stated there was no "identity” to keep from being disclosed since infant plaintiff by her mother sued (126 Misc 2d, supra, at 198), in fact, neither the court (which after in camera file examination granted partial disclosure) nor the Appellate Division, First Department, in *720 their respective decisions, revealed the identity of the infant civil plaintiff or her mother.
(6) The statute does not affect the First Amendment’s freedom of the person or penalize media accounts of sexual offenses lawfully obtained, including the accurate publication of the name of the rape victim (Cox Broadcasting Corp. v Cohn, 420 US 469 [1975]; Florida Star v B.J.F., 491 US 524 [1989]) since Civil Rights Law § 50-b only applies to public officials or employees.
While more rape victims are choosing to "come out”, pioneered in 1990 by Nancy Ziegenmeyer in the Des Moines Register and in a recently published book, aptly entitled Taking Back My Life (Summit 1991), and in 1992 followed by Patrice Bowman, who removed the blue dot, and Desiree Washington, that choice of dignity must remain with the victim, who must cope with: postrape trauma; nightmares; possible unwanted pregnancy; terrifying concern about infection with the HIV virus; and loss of a sense of personal security. Such lies behind the public policy that enacted the above 1991 amendment to Civil Rights Law §§ 50-b and 50-c, which this court strictly construes.
E. CONCLUSION
For the foregoing reasons, this court finds, in fact and law, that plaintiff is entitled to recover and the clerk of this court is directed to enter judgment in favor of plaintiff in the sum of $170,495 in compensatory damages and $200,000 in punitive damages, together with applicable interest, cost and disbursements of this action. In addition, in the absence of plaintiff’s written consent and subject to an appropriate application for disclosure, under Civil Rights Law § 50-b (2) (b), upon good cause and upon prior notice to plaintiff, the court directs this court file sealed, pending further order of the court.

 The underlying facts as found by the court and furnished to both parties herein are omitted for purposes of publication and pursuant to this court’s interpretation of Civil Rights Law § 50-b, as applicable to this civil action.