OPINION OF THE COURT
Martin Schoenfeld, J.
In this action plaintiffs Alina Hernandez and Susee Kilbanks sued defendant Wyeth-Ayerst Laboratories for using plaintiffs’ photographs on marketing materials for a line of prenatal/ postpartum vitamins beyond the one-year period set forth in, and in a manner not authorized by, the “Model Vouchers” agreed to by plaintiffs’ and defendant’s agents. After a two-week trial, a jury awarded each plaintiff $12,000 in compensatory damages and $100,000 in punitive damages.
Defendant now moves (1), pursuant to CPLR 2221, to reargue its posttrial motions and, upon reargument, pursuant to CPLR 4401, for judgment in its favor, and (2), pursuant to CPLR 4404, for judgment notwithstanding the verdict or for a new trial. For the reasons set forth herein, the motion is denied except to the extent that defendant is granted a new trial solely on the issue of punitive damages unless éach plaintiff agrees to accept $80,000 therefor.
Background
On or about August 13, 1993 the McDonald/Richards modeling agency, on behalf of plaintiffs, and photographer Fred Kenner, on behalf of defendant, contracted, as set forth in the Model Vouchers, for defendant to use plaintiffs’ modeling services, embodied in photographs, for the vitamin brochures and packaging for one year. The Model Vouchers were signed between August 13 and August 17, 1993, inclusive. Defendant *256 paid each plaintiff $1,000 plus $100 in expenses. On August 17 Kenner took the photographs. That same day, plaintiffs signed “Consent and Release” forms for the photographs that were unlimited in duration and covered “advertising” for the vitamins. Plaintiff Hernandez handwrote “Per Terms of Model’s Voucher” in her Consent and Release form.
Several days after the photo shoot, Kenner reinvoiced defendant with an invoice that, at defendant’s request, had Kenner indemnifying defendant against a broad array of claims, including the type asserted herein.
According to testimony plaintiffs introduced at trial, defendant used plaintiffs’ images during 1994 through 1997, well beyond the one-year limit of the Model Vouchers. By letter dated March 31, 1997, plaintiffs, by counsel, wrote defendant (1) that plaintiffs had become aware that defendant was continuing to use plaintiffs’ photographs, exceeding both the time and usage limits (the^ latter by using plaintiffs’ images on booklets and trade advertisements, etc.) of the Model Vouchers, and (2) that plaintiffs demanded that defendant stop such use.
Sometime that April, defendant used look-alike models to rephotograph the marketing campaign. In its moving papers, defendant states that there is no evidence that defendant continued to use the subject photographs in defendant’s marketing campaign after being notified of plaintiffs’ unauthorized use claim. However, according to plaintiffs (answering affirmation H 22), defendant’s employee testified that defendant “continued to print labels and distribute product featuring the plaintiffs’ images through at least July of 1997.” Defendant’s reply papers apparently do not dispute this statement. Defendant notes (moving affirmation 21) testimony that defendant did not pull product from shelves because of “the possibility of public alarm and concern for maternal and child health.”
Plaintiffs’ October 23, 1997 complaint alleged that defendant was continuing to use the photographs and set forth causes of action for violation of Civil Rights Law §§ 50 and 51, for breach of contract, and for quantum meruit (or a similar common-law claim). The jury verdict was solely on the Civil Rights Law claims.
Discussion
Model Vouchers and Consent and Releases
Defendant cites to Flemington Natl. Bank & Trust Co. v Domler Leasing Corp. (65 AD2d 29, 32 [1978], affd 48 NY2d 678 [1979]) for the following proposition: “It is well recognized *257 that agreements executed at substantially the same time and related to the same subject matter are regarded as contemporaneous writings and must be read together as one (Nau v Vulcan Rail & Constr. Co., 286 NY 188, 197).” Precisely. (See generally 22 NY Jur 2d, Contracts § 258, at 319 [1996] [noting that “(e)ven instruments that are made on different dates may be read together”].) Thus, the Model Vouchers and Consent and Releases must be “read together as one.” When read together as one, the one-year type-of-use limitations in the Model Vouchers control for at least four independent reasons.
First, the phrase “forever hereafter” is typewritten or word-processed on the preprinted Consent and Releases, whereas the one-year limitation is handwritten on the Model Vouchers. “In the event of repugnancy between written and printed clauses of an instrument, that which is written will prevail over that which is printed.” (22 NY Jur 2d, Contracts § 257, at 316 [1996].) Second, the one-year term is more specific than “forever hereafter.” “Where there are general and special provisions relating to the same thing, the special provisions control, even if there is an inconsistency between the specific provisions and the general provisions.” (22 NY Jur 2d, Contracts § 254, at 312 [1996].) This rule presumably recognizes that parties are more likely to have bargained over specific terms than over general language and, thus, that specific terms are more likely to indicate the intent of the parties. Third, each Model Voucher states that “this release takes precedence over any release signed at the time of job with exception of contracts and agency releases that contain the same information herein.” The Consent and Releases are a far cry from and clearly do not contain the same information as the Model Vouchers and thus are covered by the “precedence.” Fourth, plaintiff Hernandez specifically wrote that her Consent and Release was subject to her Model Voucher. Although plaintiff Kilbanks did not include such language, there is no evidence that defendant was discriminating between the models. Thus, the Hernandez handwritten language is probative, if not dispositive, on the issue of whether defendant could reasonably believe that Kilbanks was retracting her one-year and type-of-use limitations.
Cory v Nintendo of Am. (185 AD2d 70 [1st Dept 1993]), relied upon by defendant, is easily distinguishable. There, the “Model Releases” that are comparable to the instant Consent and Releases were sent by the advertiser to the model’s agent “Subsequent to each [photo] session” (at 71). This takes the *258 “Mode;! Releases” out of Flemington’s “read together as one” rule. Furthermore, the fourth factor discussed above was not present in Cory.*
Plaintiffs also have (1) a colorable argument that the circumstances surrounding the signing of the Consent and Releases mandate that they not be given force and effect, and (2) an apparently unconvincing argument based upon the problematic provenance of the Consent and Releases. Given the validity of plaintiffs’ other arguments on this point, this Court does not need to and does not reach these arguments.
In the final analysis, the issue is not, as defendant argues, whether the “precedence” clause in the Model Vouchers prevented them from being modified in the future. The issue is whether Flemington’s “read together as one” rule applies. Given the sameness of parties and subject matter and the proximity in time, this Court is convinced that the rule applies and, thus, that the rules of contract construction must be applied as if the two writings were one contract. Those rules clearly directed a finding that the term of the subject agreement was one year and that the type of use was “brochure and packaging.”
Compensatory Damages
The jury was well within its rights to award plaintiffs $12,000 in compensatory damages. The $1,000 plus $10.0 expenses defendant paid each plaintiff was for an incipient marketing campaign. The campaign was obviously something of a success, suggesting that plaintiffs could have bargained for significantly more money for an extension of rights to the original photographs or for new photographs of plaintiffs. Furthermore, the jury’s award was consistent with the (typically divergent) expert testimony that each side introduced on this issue. (See generally Nicastro v Park, 113 AD2d 129, 133 [2d Dept 1985] [“in the absence of indications that substantial justice has not been done, a successful litigant is entitled to the benefits of a favorable jury verdict”].)
Punitive Damages — Liability
Under general law, punitive damages are awarded only “in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives.” (Walker v Sheldon, 10 NY2d 401, 404 [1961] [Fuld, J.].) However, Civil *259 Rights Law § 51 provides that a person whose picture is used for advertising or trade purposes without written consent may “recover [compensatory] damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such * * * picture * * * in such manner as is forbidden * * * the jury, in its discretion, may award exemplary [i.e., punitive] damages.” Thus, punitive damages are more freely available in Civil Rights Law § 51 cases. (Welch v Mr. Christmas, 85 AD2d 74, 78 [1st Dept 1982].) Punitive damages are within the jury’s discretion. “Whether to award punitive damages in a particular case * * * [is] primarily [a] questio[n] which reside [s] in the sound discretion of the original trier of facts.” (Nardelli v Stamberg, 44 NY2d 500, 503 [1978].)
In opposition to the award of punitive damages, defendant states that defendant first became aware of plaintiffs’ unauthorized use claim in April of 1997; that the photographer never forwarded the Model Vouchers or the Consent and Releases to Wyeth; and that “plaintiffs’ counsel advised the jury that there was no claim that [defendant] should have withdrawn the product from the shelves upon being notified of plaintiffs’ claims” (moving affidavit If 22).
However, as noted above {supra at 256), the jury heard evidence that defendant continued its unauthorized use of the photographs for several months after notice in April of 1997. This postnotice use could be considered “morally culpable” under general law. In any event, Civil Rights Law § 51 gives juries the “discretion” to award punitive damages in just such instances. (See generally Cohen v Hallmark Cards, 45 NY2d 493 [1978] [finding that Appellate Division erred in setting aside section 51 punitive damages award on ground that there was not sufficient evidence to support it].)
Punitive Damages — Amount
The amount of punitive damages to award is up to the jury in the first instance, subject to the usual judicial oversight. “Except as provided by statute, there is no formula by which punitive damages are fixed * * * [T]he amount of such damages, if any, [is] primarily [a] questio[n] which reside [s] in the sound discretion of the original trier of the facts.” (Deborah S. v Diono, 153 Misc 2d 708, 711, citing Walker v Sheldon, 10 NY2d 401, 405 [1961] [Fuld, J.].) In Welch v Mr. Christmas (85 AD2d 74 [1st Dept 1982]), the jury awarded an actor plaintiff who appeared in a commercial that defendant used without authorization $1,000 in compensatory damages and $25,000 in punitive damages. “The trial court ruled the award of punitive *260 damages to be excessive and reduced such award to $15,000, to which plaintiff stipulated” (at 75). The First Department affirmed the awarding of punitive damages and the $15,000 amount as not “so excessive as to shock the conscience of this court” (at 79).
Generally speaking, judicial scrutiny of jury awards is stricter now than in the “shock the conscience” days. {See CPLR 5501 [c] [“an award is excessive or inadequate if it deviates materially from what would be reasonable compensation”]; Christopher v Great Atl. & Pac. Tea Co., 76 NY2d 1003, 1005 [1990] [affirming Appellate Division’s restoration of jury award and noting change to new standard].) After careful consideration of all the facts and circumstances, this Court finds that $80,000, which is between six and seven times the compensatory awards in this case, is the highest reasonable award the jury could have granted. (See generally Rosenberg v Lee’s Carpet & Furniture Warehouse Outlet, 80 Misc 2d 479 [Sup Ct, NY County 1974] [awarding section 51 punitive damages of $500 against one defendant and $3,500 against another defendant in the absence of compensatory damages].)
Conclusion
Whether viewed as a question of fact, a question of law, or a mixed question of fact and law, the handwritten, specific, bargained-for limitations in the Model Vouchers must take precedence (as indicated therein) over the typewritten, general, boiler plate language in the Consent and Releases that the photographer shoved in front of plaintiffs for signature at the end of the shoot. Furthermore, the jury had the discretion to award compensatory damages of $12,000 for the unauthorized use of photographs in a multi-year successful marketing campaign, and the discretion to award punitive damages of up to $80,000 for what the jury could have found was a knowing unauthorized use. Thus, the instant motion must be, and hereby is, denied except to the extent that defendant is granted a new trial solely on the issue of punitive damages unless each plaintiff agrees to accept $80,000 as such damages.

 It should also be noted that in Cory the model’s vouchers apparently did not contain the clear and more restrictive “precedence” language found in the instant Model Vouchers.