**UNITED STATES**

v.

**Jerry D. WEBSTER, Machinery Technician Second Class, U.S. Coast Guard.**

**CGCMS 24039.
Docket No. 996.**

U.S. Coast Guard Court of Military Review.

18 May 1993.

Trial Counsel: LCDR Keith B. Letourneau, USCG.

Assistant Trial Counsel: LT Monica L. Lombardi, USCG.

Detailed Defense Counsel: LT Steven J. Hipfel, JAGC, USNR.

Appellate Defense Counsel: CDR Wayne C. Raabe, USCG.

Appellate Government Counsel: LCDR Charles J. Bennardini, USCG.

Before Panel One, BAUM, BRIDGMAN, and EDWARDS, Appellate Military Judges.

EDWARDS, Judge:

In a trial before members, Appellant pled not guilty to all charges and specifications. Nevertheless, he was convicted of violating two separate lawful general regulations (four specifications), rape (one specification), assault consummated by a battery (two specifications), indecent assault (three specifications), and communicating indecent language to another (two specifications), in violation of Articles 92, 120, 128, and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 892, 920, 928, and 934 (Supp. II 1990). The convening authority approved the adjudged sentence of reduction to pay grade E–1, forfeiture of $500.00 pay per month for two months, confinement for two months, and a bad conduct discharge.[1]

Appellant submits seven assignments of error. Assignment I asserts that the evidence was insufficient as a matter of law to find Appellant guilty of rape beyond a reasonable doubt. Assignments II through V fall into two categories; that neither of the purported lawful general regulations under which he was convicted was punitive in nature, nor, in any event, was either promulgated properly. Assignment VI asserts that Appellant's special court-martial lacked jurisdiction because the Military Judge was appointed in violation of the Appointments Clause of the Constitution. The final assignment asserts that this Court lacks authority to affirm either the findings or the sentence of Appellant's special court-martial as approved by the convening authority.

The case having been fully briefed and argued, we affirm in part and reverse in part.

I.

## THE ALLEGED RAPE

A.

Although styled as a challenge purely to the legal sufficiency of the evidence, Appellant also challenges the factual sufficiency of the evidence upon which he was found guilty of rape, contending that the government failed to establish that the act of sexual intercourse was accomplished by force and without the consent of Petty Officer T, the alleged victim. The test for legal sufficiency is whether, considering the evidence in a light most favorable to the government, the trier of fact rationally could find the existence of every element of the alleged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for our not having observed the witnesses personally, we are convinced of Appellant's guilt beyond a reasonable doubt. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987).

As is common in trials where rape is charged, the description given by the participants presents differing versions of the events that transpired. There is agreement, however, on certain basic facts. At the time of the alleged rape, both Appellant and Petty Officer T were assigned to Coast Guard Station Hatteras Inlet, North Carolina. Petty Officer T resided in an off-base apartment in Frisco, North Carolina. Appellant was a Machinery Technician Second Class (E–5). Petty Officer T was a Boatswain's Mate Third Class (E–4). Although Appellant was senior in rate to Petty Officer T, the nature of their duty assignments was such that when underway on a Search and Rescue (SAR) case, he was subject to her orders as Boat Coxswain. Neither was married. Prior to the events

---

1. The court-martial order incorrectly reflects that Appellant was convicted of Specification 2 of Additional Charge I, which had been withdrawn prior to arraignment. He was, however, convicted of the remaining single specification under the additional charge. This will be corrected in our decretal paragraph.

in question, they had seen each other socially, had held hands and kissed, and Appellant had declared his love for Petty Officer T.

Based upon Petty Officer T's testimony, on an uncertain date in July of 1991, Appellant visited Petty Officer T in her apartment. No one else was present. They sat together on a couch and talked for about an hour and a half. During this period, they eventually began to hold hands and kiss.

When Petty Officer T observed her cat using a litter box in her bedroom, she arose from the couch and went to close the bedroom door. Appellant followed her. He asked her if they could go into the bedroom together. Petty Officer T said, "no." Appellant then asked Petty Officer T if they could go into the closet instead. Again, she said, "no." Appellant then pulled Petty Officer T to the living room floor. She arose and asked Appellant to leave. Appellant told her that he would do so. Petty Officer T walked toward the front door, which was located in the kitchen area of her apartment. Appellant followed her, but, rather than departing, he placed his hands on Petty Officer T's arms and backed her up against a kitchen counter. Beginning when Appellant started to push Petty Officer T backwards, she told him "no" approximately five more times. In some fashion, Petty Officer T next found herself sitting on the counter.

Petty Officer T had been wearing a bikini, a shirt, and a pair of boxer shorts. While she was sitting on the counter, Appellant pulled the shorts down, pushed the bikini bottom to the side, and inserted his fingers into Petty Officer T's vagina. Thereafter, he inserted his penis into Petty Officer T's vagina. She asked Appellant not to ejaculate inside her vagina. Appellant complied with her request and withdrew before ejaculating. After each had cleaned up, Appellant spoke a few words to her and departed.

Petty Officer T testified she did nothing to assist him in completing the act of sexual intercourse. She was not sexually aroused. Although there were instances in which Appellant had no more than one hand on Petty Officer T, she never attempted to flee. She did, however, feel that she could not move. She did not scream. Petty Officer T did not attempt to hit or otherwise physically repel Appellant, and she testified that she considered herself a "very peaceful person." Petty Officer T was angry with Appellant for what he was doing to her, but was never afraid that he might harm her, nor did he make any threats.

Petty Officer T did not report this incident to anyone until some time much later.

As was his right, Appellant elected not to testify. However, in a somewhat unusual fashion, the members were apprised of a different version of the events of July 1991 in Petty Officer T's apartment. During the government's case in chief, a Coast Guard Intelligence Special Agent was called. He testified about an interview of Appellant conducted in October of 1991. During the interview, Appellant admitted that sexual intercourse had occurred, in much the same fashion as testified to by Petty Officer T. The critical distinction in this second version is that concerning Petty Officer T's consent. As related by the Special Agent, Petty Officer T had conveyed her actual consent to intercourse through her actions. Although Petty Officer T would say "No, stop, we can't," while they were kissing and fondling each other, she responded favorably to his actions. According to Appellant's statement to the agent, these included her continuing to kiss Appellant after both had entered the kitchen, fondling his penis with her hand before he lifted or helped her onto the counter, rubbing his head during intercourse, and allowing him to ejaculate into her hand.

## B.

There are three elements of rape, *viz.*, that the accused committed an act of sexual intercourse with a certain female, that the female was not the accused's wife, and that the act of sexual intercourse was done by force and without the female's consent. ¶ 45b(1), Part IV, Manual for Courts-Martial, United States 1984 [hereinafter MCM].

Before this Court, Appellant's brief cites three cases in support of his argument

against finding legal and factual sufficiency. *United States v. Turner, supra; United States v. Bonano–Torres*, 31 M.J. 175 (C.M.A.1990); and *United States v. Townsend*, 34 M.J. 882 (C.G.C.M.R.1992). *Turner*, while stating the test for factual sufficiency, was not itself a rape case.

*United States v. Townsend, supra*, decided by another panel of this Court, although factually similar in some respects to the instant case, is distinguishable. The purported victim in *Townsend* willingly left an enlisted club with the accused late at night, and went to and then into an otherwise deserted office building with him. She freely participated in a "french-kiss" with the accused. Although she then protested against going further, when subsequently directed to "lay down" on a conference room floor, she did comply. Even after the alleged rape had occurred, she was more concerned that the accused's "buddy" would learn about the sexual intercourse, than she was upset that it had occurred at all.

Although fitting the so-called "date rape" classification, *see* n. 3 *infra*, *Bonano–Torres* involved a male Staff Sergeant and a female Specialist who apparently had not dated each other prior to an evening of dining and drinking while on a temporary assignment. On returning to their hotel, the Sergeant gained access to the victim's room in order to use the bathroom. The victim lay down on the bed and was drifting in and out of an alcohol-induced state of unconsciousness or sleep. She became aware of the Sergeant, naked, in bed with her, kissing her and massaging her breast. She told him she did not want to engage in this activity because he was married, and she kept turning her head and moving his hands. After he stopped his overtures, she again passed out or fell asleep, but similar sequences of events occurred until she finally permitted him to have intercourse so he would leave her alone and let her sleep. The Army Court of Military Review set aside the finding of rape, holding that, under Article 120, UCMJ, rape requires "proof of lack of consent *and* force" and that the force required is more than that merely incidental to the act of intercourse. *United States v. Bonano–Torres*, 29 M.J. 845, 849 (A.C.M.R.1989).

On certification to the Court of Military Appeals, the government contended that the court below incorrectly considered resistance by the victim to be an element of the offense of rape. The Court rejected this argument as misconstruing the holding of the court below and declined to extract from the lower court's opinion an "inflexible rule establishing resistance as a necessary element of [rape]" in cases not involving constructive force. *United States v. Bonano–Torres*, 31 M.J. 175, 179 (C.M.A. 1990). The Court agreed that force is required by Article 120, UCMJ, and that the conduct of the attacker and the victim need to be considered in determining whether the force used is sufficient to meet this requirement. Noting that the explanation in ¶ 45c(1)(b), Part IV, MCM, stops short of explaining what is sufficient force, the Court affirmed, stating "we find no legal error in the holding by the court below of insufficient force in this case *to the extent that it is based on the totality of the circumstances evidenced in this record.*" *Id.* (emphasis added).

■ At trial, Appellant's counsel argued vigorously that Petty Officer T's version of events was implausible. In two instances, he even alluded to the favorable testimony of the Special Agent. Yet, following proper instruction by the military judge, the members, who had had the opportunity to observe Petty Officer T while she testified, convicted Appellant of rape.[2] Applying the test of *Jackson v. Virginia, supra*, we are convinced that the government easily satisfied its burden of presenting legally sufficient proof of rape. With respect to factual sufficiency, the issue is a closer one. As

---

2. In his brief, and again during oral argument, Appellate Government Counsel contended that this Court should keep in mind that the court members also had the opportunity to observe Appellant's "demeanor in the courtroom," even though he never testified, and that they could have based their findings of guilt, at least to some extent, upon these observations. We utterly reject this contention. Aside from the obvious Fifth and Sixth Amendment problems with this novel argument, we are unaware of any legal or scientific authority for the proposition that members of a jury somehow could determine guilt or innocence based upon the

did the trial court, we reject Appellant's version of events that would lead one to conclude that Petty Officer T was a willing participant in the act of intercourse. Nevertheless, we must be convinced beyond a reasonable doubt that, under the "totality of circumstances evidenced in this record," the act of intercourse constituted rape.

Neither *Bonano–Torres* nor *Townsend* specifically addresses the determination of force and lack of consent in the "date rape" or "acquaintance rape" situation.[3] Of course, neither Article 120, UCMJ, nor ¶ 45, Part IV, MCM, makes any distinction among any types of rape. Nevertheless, in making our own determination of factual sufficiency in this case, we need not disregard the much greater research and understanding which date or acquaintance rape has received in recent years.

The characteristics of date or acquaintance rape may include (1) kissing, "necking," and fondling but no consent by the victim to subsequent sexual intercourse; (2) passive resistance[4] by the victim to the sexual advances of her attacker[5]; (3) the attacker's disregard of the victim's statement that she does not desire to engage in sexual intercourse; (4) the absence of physical threats by the attacker to his victim; (5) the failure of the victim to seize opportunities to escape from her attacker; (6) the failure of the victim to scream or cry out; (7) little or no observable physical injury to the victim; and (8) the failure of the victim to report the rape promptly. *See State In Interest of M.T.S.*, 129 N.J. 422, 609 A.2d 1266 (1992); *Deborah S. v.*

*Diorio*, 153 Misc.2d 708, 583 N.Y.S.2d 872 (N.Y.C.Civ.Ct.1992); *State In Interest of J.F.S.*, 803 P.2d 1254 (Ut.Ct.App.1990); *State v. McKnight*, 54 Wash.App. 521, 774 P.2d 532 (1989); *Key v. State*, 765 S.W.2d 848 (Tex.Ct.App.1989); *Rhodes v. State*, 74 Md.App. 680, 539 A.2d 1160 (1988); *Dolchok v. State*, 763 P.2d 977 (Ak.Ct.App.1988); *Shaw v. State*, 764 S.W.2d 815 (Tex.Ct.App.1988).

Review of these apparently not uncommon characteristics of date rape helps to illuminate this troubling area, and amply supports the actions of the various legislatures that have modified the statutory provisions concerning lack of consent and resistance to force, but does not answer the critical questions which we must decide. Did Appellant employ force more than that incidental to the act of intercourse and did Petty Officer T make "her lack of consent reasonably manifest by taking such measures of resistance as [were] called for by the circumstances"? ¶ 45c(1)(b), Part IV, MCM.

There is no evidence that Petty Officer T had engaged in intercourse with Appellant, under any circumstances, prior to the July, 1991, incident. On that day, she did hold hands with and kiss Appellant for a period of time; however, even under Appellant's version of events, she consistently and repeatedly told him "no" when in the living room and broke off physical contact and went into the kitchen. According to Petty Officer T, when Appellant pulled her to the floor, she immediately stood up and asked him to leave and she continued to say "no"

"body language" of an accused during the course of a trial in which he or she did not testify.

**3.** These two terms can be and have been used interchangeably. *See, e.g., Deborah S. v. Diorio*, 153 Misc.2d 708, 583 N.Y.S.2d 872, 876 (N.Y.C. Civ.Ct.1992): *Rhodes v. State*, 74 Md.App. 680, 539 A.2d 1160 (1988). There does, however, appear to be a distinction. A "date rape" is generally one committed by a person with whom the victim has had some romantic attachment or actually is on a date. *See Key v. State*, 765 S.W.2d 848 (Tex.Ct.App.1989). An "acquaintance rape" is a more general term and is applied to one committed by a person who is known to the victim to such an extent that the victim probably would not anticipate the crimi-

nal conduct. *See Dolchok v. State*, 763 P.2d 977 (Ak.Ct.App.1988).

**4.** "[S]tudies show that resistance increases the risk that the perpetrator will employ violence or that the victims will receive greater injuries than if no resistance were offered." *State v. McKnight*, 54 Wash.App. 521, 774 P.2d 532, 534 (1989). "Other studies indicate that, while some women respond to sexual assault with active resistance, others freeze." *State In Interest of J.F.S.*, 803 P.2d 1254, 1257 n. 4 (Ut.Ct.App.1990), *citing People v. Barnes*, 42 Cal.3d 284, 228 Cal. Rptr. 228, 237, 721 P.2d 110, 118 (1986).

**5.** "Attacker" is an accurate term, even in the context of a date or acquaintance rape. *See Deborah S. v. Diorio*, 583 N.Y.S.2d at 876–878.

and to resist his physical advances in the kitchen.[6] Despite the absence of threats by Appellant and Petty Officer T's lack of fear, we find there was more force applied by Appellant than that incidental to the act of intercourse. Petty Officer T's failure either to cry out or to attempt to flee, or to strike Appellant, do not lead us to believe that her resistance was insufficient to make her lack of consent reasonably manifest.[7] Accordingly, considering the totality of circumstances, *United States v. Bonano–Torres, supra; United States v. Williamson,* 24 M.J. 32 (C.M.A.1987), we find that the charged act of sexual intercourse "was done by force and without her consent." ¶ 45b(1)(c), Part IV, MCM.[8]

## II.

## THE "LAWFUL GENERAL REGULATIONS"

### A.

Assignments of Error II through V attack the validity of two purported lawful

general regulations, contending that neither was a "punitive" regulation nor, in any event, was either promulgated properly. The government responds that these issues were waived and that the regulations were issued properly as punitive regulations.

Article 92, UCMJ, 10 U.S.C. § 892, provides that "[a]ny person subject to this chapter who—(1) violates or fails to obey any lawful general order or regulation ... shall be punished as a court-martial may direct." The three elements of this offense are that (1) "there was in effect a certain lawful general order or regulation;" (2) "the accused had a duty to obey it;" and (3) "the accused violated or failed to obey the order or regulation." ¶ 16b(1), Part IV, MCM. At issue is the first element.

The first purported lawful general regulation challenged is Chapter 4 of the Coast Guard Military Civil Rights Manual, Commandant Instruction M5350.11B. The ver-

**6.** In that portion of his opinion dissenting from our affirmance of the rape conviction, Chief Judge Baum correctly notes that Petty Officer T successfully terminated Appellant's advances during a similar incident the following September. While her response in September certainly supports the Chief Judge's position that she could have and should have done more in July, it is also possible that Petty Officer T learned enough from the first incident to enable her to prevent the second from leading to another rape.

**7.** We do not share Chief Judge Baum's view that "at some point Petty Officer T consented to the act of intercourse, either because she changed her mind or because she simply wanted to get rid of Appellant, in the same manner as the alleged victim in *U.S. v. Bonano–Torres.*" First, there is no credible evidence that she ever consented to intercourse and she specifically denied doing so. Second, while Petty Officer T could have done more to prevent the act of intercourse, we do not find that she acquiesced to it as did the purported victim in *Bonano–Torres.*

**8.** Although we have found sufficient evidence of force and lack of consent, using the "totality of the circumstances" test, a better alternative would be explicit recognition of the trend toward defining rape as a sexual assault requiring only the lack of consent of the victim and establishing degrees of seriousness of the offense commensurate with the extent of force involved

or other aggravating circumstances. *See, e.g., State In Interest of M.T.S.,* 129 N.J. 422, 609 A.2d 1266 (1992); *People v. Salazar,* 144 Cal.App.3d 799, 193 Cal.Rptr. 1 (1983). In the absence of a reform of Article 120, UCMJ, we are left to the unguided *ad hoc* application of the trial court's classification of "degrees" of rape, as reflected in the sentence adjudged. In this regard, I wholeheartedly agree with Judge Bridgman's excellent analysis of the difficulties involved in applying Article 120(a), UCMJ, as currently enacted. In my view, we are attempting to apply a 1950's law to the post-"sexual revolution" morality [or lack of it] of the 1990's. Acknowledgment of this problem calls for change in the law. One example of a better approach is New Jersey's more recent statutory revision, under which "permission to engage in sexual [intercourse] must be affirmative and it must be given freely, but that permission may be inferred either from acts or statements reasonably viewed in light of the surrounding circumstances." *State In Interest of M.T.S.,* 609 A.2d at 1277. This formulation adequately balances the rights of both the alleged victim of sexual assault and the accused. At a time when the number of women in the Armed Forces is growing (as of 30 September 1992, 6.7% of the Coast Guard commissioned officer corps, and 7.9% of Coast Guard enlisted members were women. *See* Coast Guard Office of Personnel and Training Workforce Demographics sheet), it is imperative that more action be taken to prevent date or acquaintance rape. Amending Article 120, UCMJ, would be one step in the right direction.

sion of this Instruction in effect on the date of Appellant's alleged offenses was issued by W.R. Somerville, Chief, Coast Guard Office of Civil Rights. (We note judicially that Mr. Somerville is a civilian member of the Senior Executive Service [SES]). Chapter 4 of this Instruction, which is referenced in the challenged specifications, is entitled "Sexual Harassment." This chapter, by its own terms,

1. defines sexual harassment,
2. sets forth the Commandant's policy on sexual harassment, and
3. prescribes the expected action of Coast Guard military and civilian personnel.

The chapter contains a lengthy definition of sexual harassment, a "Policy Statement," two pages of "Discussion," and separate sections on "Responsibilities," "Reporting Procedures," and "Action." The penultimate section provides, *inter alia,* that

> [S]pecific acts of sexual harassment may be punishable under various provisions of the Uniform Code of Military Justice, including:
>
> a. ...
>
> b. Article 92 (Violation of *existing* general regulations, including provision of Chapter 8 of Commandant Instruction M5000.3 (series), U.S. Coast Guard Regulations) (emphasis added).
>
> c. ...

Chapter 4 of the Military Civil Rights Manual does not itself contain a statement to the effect that it is a lawful general order or regulation.

The second purported lawful general regulation challenged by Appellant is Article 8–H of the Coast Guard Personnel Manual, Commandant Instruction M1000.6A. The version of this Instruction in effect on the date of Appellant's alleged offenses was issued by then Captain G.F. Woolever in his capacity as Acting Chief, Office of Personnel and Training. Article 8–H had five sections dealing generally with fraternization and inappropriate personal relationships among senior and junior military members. Article 8–H–5c stated, "[t]his section constitutes a punitive general order under the UCMJ, and violations of its provi-

sions are subject to prosecution under Articles 92 and 134 of the UCMJ."

### B.

█ In attacking these purported lawful general regulations, the first hurdle Appellant must overcome is whether we should address his assertions at all. At trial, the government requested that the Military Judge take judicial notice of the pertinent portions of each of the Commandant Instructions. Detailed Defense Counsel did not object, and the Military Judge did take judicial notice of them, later instructing the members on the content of each and the effect of his having taken judicial notice.

The government argues that Appellant has waived the right to contest the validity of these purported lawful general regulations before this Court. We disagree.

Concededly, there is some authority for the government position. *See* R.C.M. 801(g); *United States v. Thompson,* 31 M.J. 781 (A.C.M.R.1990) (In a "not guilty" plea trial, the military judge took judicial notice of a local general regulation, overruling the defense objection that it had not been filed and authenticated correctly. The Army Court of Military Review held that the issue of whether the regulation originally had been issued properly was waived for purposes of appellate review). *Cf. United States v. Hawkins,* 30 M.J. 682 (A.F.C.M.R.1990) (In a "guilty" plea case, "[d]eterminations of lawfulness of orders are interlocutory questions of law to be resolved by the military judge upon proper motion made at trial. R.C.M. 801(e)(1) and (5) Discussion. Failure to raise the question of lawfulness of an order by motion during the trial constitutes waiver of the issue." *Id.* at 684).

The greater weight of authority, however, would permit appellate review. In *United States v. Hilton,* 27 M.J. 323 (C.M.A.1989), a "not guilty" plea case, the Court allowed the accused to raise constitutional and statutory questions concerning a purported lawful general regulation, although they had not been raised at trial, observing that one of the reasons for not applying the waiver doctrine is "when this

Court deems review necessary on its own motion." *Id.* at 326. In *United States v. Lumagui,* 31 M.J. 789 (A.F.C.M.R.1990), the Air Force Court of Military Review, citing *Hilton,* went one step further and allowed a constitutional challenge to a specification alleging violation of a lawful general regulation, even though the accused had entered unconditional pleas of guilty. The Air Force Court opined that "[i]n our analysis, such a specification fails to state an offense, a defect that is never waived. R.C.M. 907(b)(1)(B); *accord,* Mil.R.Evid. 103(a)." *Id.* at 790. *Cf. United States v. Scott,* 32 M.J. 644 (C.G.C.M.R.1991). (This Court allowed a constitutional challenge to Article 120[b], UCMJ, although the accused had pled guilty and failed to raise the issue at trial).

Although not a constitutional challenge, the issue which Appellant raises is an important one. As Appellant was charged with violating these two purported lawful general regulations, so might other Coastguardsmen be. *See, e.g., United States v. Townsend, supra* (Conviction of accused, who never challenged validity of Article 8–H–5 of the Coast Guard Personnel Manual, affirmed on review). On its face, each specification does appear to allege "every element of the charged offense expressly or by necessary implication." R.C.M. 307(c)(3). *See also United States v. Sell,* 3 U.S.C.M.A. 202, 11 C.M.R. 202 (1953). *Cf. United States v. Watkins,* 21 M.J. 208 (C.M.A.1986). (An unauthorized absence specification missing the words, "without authority," is defective, although not fatally so). However, rather than deciding whether the specifications are defective (as our sister Court of Military Review did in *United States v. Lumagui, supra* ), we prefer instead to view this as an assertion of the failure of proof of one of the elements of the offense, *i.e.,* "[t]hat there was in effect a certain lawful general order or regulation." ¶ 16b(1)(a), Part IV, MCM. Article 66(c), UCMJ, 10 U.S.C. § 866(c), provides that a "Court of Military Review ... may affirm only such findings of guilty ... as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." If Appellant is

correct, that neither of the challenged regulations is a valid "lawful general regulation," we would fail "to meet our uniquely broad and independent review responsibilities," *United States v. Francis,* 25 M.J. 614, 618 (C.G.C.M.R.1987), were we to apply the waiver doctrine as sought by the government. "[W]hile it is the general rule that failure to make a timely motion at trial *may* estop one from raising the issue on appeal, failure to raise the issue does not preclude the Court of Military Review in the exercise of its powers from granting relief." *United States v. Evans,* 28 M.J. 74, 76 (C.M.A.1989), *quoting United States v. Britton,* 26 M.J. 24, 27 (C.M.A.1988). Accordingly, we shall address the validity of the two regulations on the merits.

### C.

"Knowledge of a general order or regulation need not be alleged or proved, as knowledge is not an element of this offense and a lack of knowledge does not constitute a defense." ¶ 16c(1)(d), Part IV, MCM. The validity of such regulations, creating as they do what amounts to "strict liability" for the unwary, should be very closely examined. We have serious doubts that the challenged portion of the Military Civil Rights Manual meets the requirements of a "punitive" general order or regulation, *see United States v. Asfeld,* 30 M.J. 917, 923 (A.C.M.R.1990), although Article 8–H of the Personnel Manual does appear adequate. In any event, we may resolve this matter on the alternative ground urged by Appellant, that neither instruction was promulgated properly.

A general order or regulation may be

properly published by the President or the Secretary of Defense, of Transportation, or of a military department, and those orders or regulations generally applicable to the command of the officer issuing them throughout the command or a particular subdivision thereof which are issued by:

 (i) an officer having general court-martial jurisdiction;

 (ii) a general or flag officer in command; or

(iii) a commander superior to (i) or (ii). ¶ 16c(1)(a), Part IV, MCM.

As noted in Part II–A., *ante*, the Military Civil Rights Manual was issued by the civilian Chief of the Office of Civil Rights. The contested Personnel Manual provisions were issued by the Chief of the Coast Guard Office of Personnel and Training (Acting). We may judicially notice (and the government conceded at oral argument) that neither of these Coast Guard Headquarters Office Chiefs meets the qualifications of ¶ 16c(1)(a), Part IV, MCM.

Citing *United States v. Bartell*, 32 M.J. 295 (C.M.A.1991), the government argues, however, that so long as the decisional authority to issue the directives remained in the Commandant (who we agree is both an officer with general court-martial jurisdiction and a flag officer in command), it matters not who signed the promulgating document. With this argument we agree; however, it is inapposite in this case.

*United States v. Breault*, 30 M.J. 833 (N.M.C.M.R.1990) (cited by the Court of Military Appeals in *Bartell*), was a "guilty" plea case in which the accused had been convicted of violation of a lawful general order. The "Chief of Staff," not the Commanding General, of Camp Lejeune Marine Corps Base had signed the purported general order. After judicially noticing two Secretary of the Navy instructions, the *en banc* Navy–Marine Corps Court of Military Review found a potential ambiguity in that a "Chief of Staff" signature "may connote either a ministerial signing or a genuine exercise of delegated discretionary, decision-making authority by the signatory." *Id.* at 838. The Court assumed that "the discretionary, decision-making au-thority embodied in the issuance of a general order or regulation is non-delegable," but held that someone else, properly authorized, may sign the order, provided the commander "at least personally [knew] and approve[d] of [its] content." *Id.* The Court was prepared to apply a "presumption of regularity ... to support a finding that the order was duly signed by a person authorized to sign it," *id.*, but instead held that the accused's provident pleas of guilty admitted that the Camp Lejeune Chief of Staff had the necessary authority to sign the order. Senior Judge Alberston dissented on the basis of her belief that punitive general orders or regulations must be signed personally by the officer authorized to issue them.

*United States v. Bartell, supra*, similarly was a "guilty" plea case, involving violation of a purported lawful general order issued "By Direction" at the Marine Corps Air Ground Combat Center, Twentynine Palms, California. The Court of Military Appeals held that "Article 92(1) [UCMJ] requires only that the order be *issued* as a result of the personal decision of a [flag] officer." 32 M.J. at 296. The Court rejected the "strict-construction" view of the dissent in *Breault*, for the "simple reason" that the accused had pled guilty. *Id.* at 297.

With these two precedents [9] in mind, we review the instant case. Appellant pled "not guilty" to all of the charges. Accordingly, the burden was on the government to prove every element of the Article 92(1), UCMJ, offenses beyond a reasonable doubt. R.C.M. 920(e)(5). As the Navy–Marine Corps Court did in *Breault*, we take judicial notice of the pertinent Coast

---

9. In the recent unpublished decision, *United States v. McCrary*, NMCM 90 3247 (N.M.C.M.R. 2 April 1993), which, under that Court's internal rules, "does not serve as precedent," the Navy–Marine Corps Court of Military Review followed these two precedents in a "conditional guilty plea" case. The accused had been convicted of violating a purported lawful general order ("Air Base Order 1746.1"), which had been signed by the Chief of Staff, not the Commanding General. The issue of the Chief of Staff's authority to sign the order was raised by motion at trial and denied. The Navy–Marine Corps Court noted that "signature 'By Direction' or by the Chief of Staff is normal practice in the Naval Service." The Court held that, in the absence of evidence to the contrary, it would infer "that the Chief of Staff who signed the order in this case acted within his lawful delegated signature authority and that the decision to issue the order and the determination of its substantive contents were made by the Commander." We note that neither of the purported lawful general regulations at issue in this case was signed "By direction" or by the Coast Guard Chief of Staff, so the rationale of *McCrary* is inapposite in this case.

Guard directive, Coast Guard Headquarters Instruction M5402.3D, "Delegation of Authority." Section 1–B thereof provides:

By this instruction, the Commandant delegates to all office and division chiefs at Headquarters the authority to carry out the full range of their program requirements with wide latitude for independent judgment and action. This encompasses the full spectrum of management, administrative, and technical functions, and includes the signing of correspondence except as noted in Chapter 5.

Section B–2.c of Chapter 5 authorizes Headquarters Office Chiefs to exercise "signature authority" with regard to Commandant Instructions (which both the Military Civil Rights and the Personnel Manuals are) "[u]nless otherwise restricted." "Otherwise restricted" is not otherwise defined.

■ We are left with the type of ambiguity which the Navy–Marine Corps Court of Military Review faced in *Breault.* It appears that it was well within the authority of the Chiefs of the Offices of Civil Rights and Personnel and Training to issue the Military Civil Rights Manual and the Personnel Manual, respectively. If they did so under the general, *delegated* authority from the Commandant found in Sections 1–B and 5–B–2.c, of Headquarters Instruction M5402.3D, these were not "lawful general regulations" because neither Office Chief meets the requirements of ¶ 16c(1)(a), Part IV, MCM. If, however, they merely signed the instructions at the personal direction of the Commandant, then the requirements of ¶ 16c(1)(a), Part IV, MCM, would be satisfied. *United States v. Bartell,* 32 M.J. at 296. The record contains nothing to resolve this ambiguity, and the government has not submitted any documentation to demonstrate that the Commandant even was aware of either of the instructions before issuance, *e.g.,* a yellow Clearance Sheet, Form CG–3584.

We previously have upheld purported lawful general regulations against similar appellate attack. *See United States v. Friedman,* 14 M.J. 865 (C.G.C.M.R.1982) ("[S]tipulation implicitly recognize[d] that

Coast Guard Regulations were promulgated by the Commandant." *Id.* at 866); *United States v. Hotchkiss,* 13 M.J. 851 (C.G.C.M.R.1982) (*citing United States v. Kennedy, infra* ); *United States v. Kennedy,* 11 M.J. 669 (C.G.C.M.R.1981) (Article 9–2–15 of "Coast Guard Regulations" is punitive and was "issued by the Commandant in his own right." *Id.* at 671); *United States v. Allen,* 6 M.J. 633 (C.G.C.M.R. 1978) ("[T]he Commandant is unquestionably within that class of Commanders found by the Court of Military Appeals to have authority to promulgate general orders or regulations in contemplation of Article 92(1) Uniform Code of Military Justice." *Id.* at 636). In each of these cases, the Court was satisfied that the Commandant *personally* had issued the general regulation. We are not so satisfied here.

In light of Appellant's pleas of "not guilty" and the broad grant of discretionary decisional authority in Coast Guard Headquarters Instruction M5402.3D, and in the absence of any evidence that the Commandant personally directed that the pertinent portions of the two Commandant Instructions be issued, we are unwilling to apply a "presumption of regularity" in order to affirm any of the Article 92(1) specifications. Accordingly, we shall set aside and dismiss those specifications in our decretal paragraph.

## III.

## APPOINTMENT OF THE MILITARY JUDGE

Appellant's sixth assignment of error asserts that his special court-martial lacked jurisdiction because the Military Judge was appointed in violation of the Appointments Clause of the Constitution. We reject this argument. *See United States v. Weiss,* 36 M.J. 224 (C.M.A.1992); *United States v. Kovac,* 36 M.J. 521, 522 (C.G.C.M.R.1992).

## IV.

## AUTHORITY OF THE COURT OF MILITARY REVIEW

Appellant's final assignment of error asserts that this Court lacks authority to

affirm either the findings or the sentence of the special court-martial as approved by the convening authority. He contends (1) that the Appellate Military Judges were appointed in violation of the Appointments Clause; (2) that the Appellate Military Judges lack a specified term of office thereby resulting in a fundamental denial of due process; and (3) this Court contains Appellate Military Judges who serve on only a collateral duty basis. We reject these arguments also. *See United States v. Weiss, supra; United States v. Kovac, supra.*

## V.

### APPOINTMENT OF THE CURRENT JUDGES OF THE COAST GUARD COURT OF MILITARY REVIEW

Article 66(a), UCMJ, 10 U.S.C. § 866(a) provides that "[e]ach Judge Advocate General shall establish a Court of Military Review...." It appears that Congress, in originally enacting Article 66, UCMJ, in 1950, contemplated that the members of the then Boards of Review would be appointed by the appropriate Judge Advocates General. *See* S.REP. NO. 486, 81st Cong., 2nd Sess. 28, *reprinted in* 1950 U.S.CODE CONG. & ADMIN.NEWS 2222, 2253; 96 CONG.REC. 1362 (1950), *reprinted in* 2 Index and Legislative History to the Uniform Code of Military Justice, 1950 at 1769 (1985). *Cf. United States v. Prive,* 35 M.J. 569 (C.G.C.M.R.1992) ("A fair reading of [Article 66(a), UCMJ] leads to the inevitable conclusion that the Judge Advocate General has the power to designate the judges of the Courts of Military Review." *Id.* at 571). However, unlike the original Article 67, UCMJ, 10 U.S.C. § 867, which provided for Presidential appointment of the judges of the Court of Military Appeals, or the original Article 70, UCMJ, 10 U.S.C. § 870, which provided for appointment of appellate counsel by the Judge Advocate General, Congress has not designated any *single* specific official to appoint members to a Court of Military Review. *See* S.REP. NO. 1601, 90th Cong., 2nd Sess. 3, *reprinted in* 1968 U.S.CODE CONG. & ADMIN.NEWS 4501, 4503.

49 U.S.C. § 323(a) (Supp. II 1990) provides, "[t]he Secretary of Transportation may appoint and fix the pay of officers and employees of the Department of Transportation and may prescribe their duties and powers." While review in this case was pending, on 15 January 1993, pursuant to his authority, the Secretary of Transportation, the Honorable Andrew H. Card, Jr., issued a memorandum to the Chief Judge, U.S. Coast Guard Court of Military Review, concerning appointment of appellate military judges to the Coast Guard Court of Military Review. *See* Appendix A. On 26 January 1993, by order of this Court, appellate counsel were provided a copy of the Secretary's memorandum and permitted to file additional pleadings. In response thereto, Appellant has asserted that the Secretary's memorandum has no effect on the purportedly improper appointment of the members of this Court. In light of current precedent, we need not rule on this issue. *See United States v. Weiss, supra; United States v. Kovac, supra. See also United States v. Senior,* 36 M.J. 1016, 1018 (C.G.C.M.R.1993).

■ Appellant also has questioned the manner in which the Secretary's memorandum came into existence. By separate order, a copy of a memorandum prepared by the Chief Judge of this Court, addressed to the Chief Counsel of the Coast Guard, was provided to counsel. *See* Appendix B. Appellant now asserts that "[i]f any judge of this Court was involved in the creation of the memorandum to the Secretary, that judge must be disqualified from participating in the decision of this case." As Appendix B indicates, *all* of the members of this Court were involved in its creation. Nevertheless, we disagree with Appellant's assertion.

Article 66(h), UCMJ, 10 U.S.C. § 866(h) provides:

No member of a Court of Military Review shall be eligible to review the record of any trial if such member served as investigating officer in the case or served as a member of the court-martial before which such trial was conducted, or served as military judge, trial or defense

counsel, or reviewing officer of such trial.

As Appellant acknowledges and we agree, none of the members of this Court falls within the ambit of these prohibitions. Article 66(h) notwithstanding, "any relationship of a judge of the Court of Military Review which casts suspicion upon his fairness or impartiality provides a basis to seek his disqualification." *United States v. Kincheloe*, 14 M.J. 40, 48 (C.M.A.1982) (citations omitted).

As the Court of Military Appeals did in *Kincheloe*, and the Army Court of Military Review did in *United States v. Martinez*, 19 M.J. 652 (A.C.M.R.1984), we shall look for guidance to the primary Federal statute concerning judicial disqualification, 28 U.S.C. § 455 (Supp. II 1990).[10] This statute provides, in pertinent part:

§ 455. Disqualification of justice, judge, or magistrate

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

. . . .

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

Accordingly, we look to each of the pertinent sections of 28 U.S.C. § 455. As subsection (b) contains the more specific provisions, we begin with 28 U.S.C. § 455(b)(1).

Appellant does not contend, nor is there any reason to believe, that any member of this Court harbors any "personal bias or prejudice" against him. As Appendix B reveals, the Court was concerned solely with a *matter of law*, and nothing conveyed by the Chief Judge to the Chief Counsel concerned "disputed evidentiary facts." *See Laird v. Tatum*, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (Memorandum of Mr. Justice Rehnquist) (1972); *Cf. In re M. Ibrahim Khan, P.S.C.*, 751 F.2d 162 (6th Cir.1984) (In affirming a bankruptcy judge's denial of a motion to disqualify him, the court opined that "bias sufficient to justify recusal must be a personal one and not one arising from the judge's view of the law." *Id.* at 164 [citation omitted] ).

With respect to 28 U.S.C. § 455(b)(3), not only was no "opinion concerning the merits of the particular case in controversy" expressed, but neither this case, nor any other pending review in this Court, was even mentioned.

Returning to subsection (a) of 28 U.S.C. § 455, we note that the Eleventh Circuit has opined that

[t]here are twin, and sometimes competing, policies that bear on the application of [its] standard. The first is that courts must not only be, but must seem to be, free of bias or prejudice. Thus the situation is viewed through the eyes of the objective person. A second policy is that a judge, having been assigned to a case, should not recuse himself on unsupported, irrational, or highly tenuous speculation. If this occurred the price of maintaining the purity of the appearance of justice would be the power of . . . parties to exercise a veto over the assignment of judges.

*United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir.1986). *See also United States v. DeLuna*, 763 F.2d 897, 907 (8th Cir.1985) ("Every magistrate, judge and justice must 'disqualify himself in any

---

**10.** Various provisions address the disqualification of judges. For instance, R.C.M. 902 applies to disqualification of a military judge. 28 U.S.C. § 144 (Supp. II 1990) applies strictly to proceedings in a Federal district court. "Section 455 [of Title 28, U.S.C.] is a broader statute [than Sec-

tion 144] in that it applies to members of the Supreme Court, to members of the Courts of Appeals, to district judges, to federal magistrates and bankruptcy judges." *Pilla v. American Bar Ass'n*, 542 F.2d 56, 58 (8th Cir.1976).

proceeding in which his impartiality might reasonably be questioned.' *Disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality."* [citations omitted] [emphasis added] ).

As this Court does not rely upon the existence of the Secretary's memorandum to support any ruling in this case, the memorandum cannot be said to have affected the outcome. *Cf. United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) ("The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source *and result in an opinion on the merits* on some basis other than what the judge learned from his participation in the case." 384 U.S. at 583, 86 S.Ct. at 1710. [emphasis added] ). Moreover, on the question of disqualification, it is significant that this Court was not acting as an advocate either for or against Appellant. Rather, the Court was seeking to insure its continued ability to provide appellate review of *all* cases properly before it. To have stood by and done nothing would have been a virtual abandonment of our responsibilities to the military justice system imposed upon us by Congress in Article 66, UCMJ. In the absence of a better alternative, and none suggests itself to us, our communication with the Chief Counsel of the Coast Guard must be viewed as an act of jurisdictional self-preservation, similar to that of the Navy–Marine Corps Court of Military Review in *U.S. Navy–Marine Corps Court of Military Review v. Carlucci*, 26 M.J. 328 (C.M.A.1988). In that case, our sister Court filed a petition with the Court of Military Appeals seeking extraordinary relief in the nature of an injunction. This action was preceded by Court members' extensive communications with officials in the offices of the Judge Advocate General of the Navy and the Department of Defense Inspector General. While the circumstances in that case and this are completely different, one of the underlying principles is the same. That is that a Court of Military Review such as ours is entitled to take necessary steps to

insure the integrity of its judicial processes. We believe that, in seeking Secretarial appointment of our members, we have not violated this principle. Accordingly, viewing our actions from the objective perspective required by 28 U.S.C. § 455(a), we hold that we are not disqualified from deciding Appellant's case.

A different principle of law also compels us to reject Appellant's argument for our disqualification, *i.e.*, the "Rule of Necessity." Simply stated, this rule provides that when all judges are disqualified to decide a case, no judge is disqualified. *See United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980); *Duplantier v. United States*, 606 F.2d 654 (5th Cir.1979); *Atkins v. United States*, 214 Ct.Cl. 186, 556 F.2d 1028 (1977); *Pilla v. American Bar Ass'n*, 542 F.2d 56 (8th Cir.1976); *United States v. Senior, supra*. All five judges of this Court participated in the decision to seek the Secretary's action. Although we hold that we are not disqualified in Appellant's case, even if we otherwise might be so considered, the "Rule of Necessity" precludes our recusal or disqualification.

## VI.

### ACTION

The findings of guilty of Charge I, Specifications 1, 3, and 4, and Additional Charge I and its single Specification, are set aside and dismissed. The remaining findings of guilty are affirmed. Upon reassessment of the sentence in light of the reduced findings of guilty and the entire record of trial, *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986), we are satisfied that the sentence is no greater than that which would have been imposed absent the now set aside findings of guilty. We also independently have reviewed the appropriateness of the sentence, *United States v. Snelling*, 14 M.J. 267 (C.M.A.1982), and find it appropriate. Accordingly, the sentence is affirmed. An appropriate supplemental court-martial order shall be issued to reflect the action of this Court on the findings and sentence and to correct the error noted in footnote 1.

BRIDGMAN, Judge (concurring).

I concur with Judge Edwards' opinion and write separately to express my views that, as Article 120(a), UCMJ is currently applied, the offense of rape in the military justice system is guided, not by law, but by individual perceptions of the offense. This is unsatisfactory.

Until the recent amendment by Section 1066 of the National Defense Authorization Act for Fiscal Year 1993, Pub.L. No. 102–484, Oct. 23, 1992, 106 Stat. 2315, 2506, making the offense sex neutral, Article 120(a) has remained unchanged since its enactment. Even with this change, the essential elements of the offense are an act of intercourse, by force, and without the consent of the victim. It is a capital offense. The statute provides no degrees of rape. The President, by Executive Orders promulgating the various editions of the Manual for Courts–Martial, has not provided varying degrees of punishment for rape, distinguished by the degree of force involved or other aggravating factors. Yet, in practice, rape has innumerable permutations, existing solely in the minds of those implementing the military justice system.

Initially, a convening authority exercising general court-martial (GCM) jurisdiction has the following choices, solely at his or her discretion: (1) refer to a GCM as a capital case; (2) refer to a GCM as a noncapital case; (3) refer to a special court-martial; (4) refer to a summary court-martial; (5) handle under Article 15, UCMJ, 10 USC § 815; or (6) take no disciplinary action. Assuming there is a reasonable belief that the accused has committed the offense and that proof is available, it may be that a convening authority has seldom selected options (4) through (6), but the reported cases provide ample evidence that options (1) through (3) have been selected, all without authoritative guidance.

The instant case demonstrates the effect of this lack of guidance and how it extends to individual members of the military community. The case was treated as non-capital, and despite the presence of other serious charges, was referred to a special court-martial. Thus, the members were instructed that the maximum punishment they could adjudge was limited to a bad conduct discharge (BCD) and confinement for six months. The members, having found the act of intercourse was by force and without consent, awarded a sentence that included a BCD and confinement for only two months. This strongly suggests that, in the minds of both the convening authority and the court members, there are degrees of rape. What those degrees are is anybody's guess. *See also United States v. Carroll*, 30 M.J. 598 (C.G.C.M.R. 1990), a general court-martial, where several witnesses expressed opinions that the offense should have been handled under Article 15, UCMJ and the sentence awarded was a bad conduct discharge, confinement for eight months, and reduction to pay grade E–1.

I have a great deal of respect for Chief Judge Baum's conclusion that, under the existing statutory provisions and applicable case law, he is unable to find, beyond a reasonable doubt, that the requisite element of force was established or that the act of intercourse was accomplished despite Petty Officer T's lack of consent. Aside from the issue of whether there should be degrees of rape, with differing punishments dependent on the degree of force or other circumstances, the current guidance on the elements of the offense is less than lucid. Force and lack of consent are sometimes treated as a single element and at other times distinguished. Consent is sometimes treated as a state of mind and sometimes related to the physical manifestations of the victim conveying a lack of consent. Again, to an unfortunate extent, rape is in the mind of the beholder.[1] The difficulty in resolving the issues factually is compounded when it must be made during appellate review, twice removed from the events.

If the victim is incapable of consent, no force beyond that implicit in the act of intercourse is required to prove rape.

---

1. It has been noted that a woman may honestly believe she has been raped, when, as a matter of law, she has not. *See United States v. Davis*, 20 M.J. 903 (A.C.M.R.1985).

Since any penetration, however slight, completes the act of intercourse, force, as commonly understood, has effectively been removed as an element under these circumstances.

If the victim is capable of giving consent, how much force is required? As recognized by the court in *United States v. Bonano–Torres*, 31 M.J. 175 (C.M.A.1990), the Manual for Courts–Martial does not explain what is sufficient force, but the court affirmed that there must be "more than the incidental force involved in penetration," *id.* at 179, unless, of course, you have constructive force. Without adding to the length of the decision in this case by an analysis of all the cases involving constructive force, arguably "constructive force" is applied where there has been in fact, no actual force, but the acts are felt to be reprehensible. Interested readers may peruse the four separate opinions in *United States v. Clark*, 35 M.J. 432 (C.M.A.1992) and the cases cited therein for such illumination as they may find on the application of actual or constructive force.

It appears to me that the case law supports a liberal interpretation of the requirements of Para. 45c(1)(b) of the MCM concerning the extent of resistance required and the circumstances under which the victim concludes that resistance would have been futile. Certainly the cases have been liberal in finding that there were threats of death or great bodily harm, thereby justifying the application of the doctrine of constructive force and finding rape in the absence of actual force. The cases have also been liberal in allowing the testimony of expert witnesses to the effect that, in date or acquaintance rape cases, the victim may not scream, forcibly resist, or attempt to escape. These expert views may be considered by the trial court members even in the abstract, where the expert has not examined the victim. *See United States v. Houser*, 36 M.J. 392 (C.M.A.1993). I believe this court can properly consider these matters in weighing the evidence in a case before it.

In my view, we do a disservice to members of the Armed Services [formerly only the women, but now males as well] to insist that they resist up to the moment of penetration, or to require them to fear for their life or "great bodily harm," whatever that may mean in the context of rape. Para. 45c(1)(b), Part IV, 1984 MCM, recognizes the concept of "futility." There is expert support for the concept that there usually is a point at which a woman in a date or acquaintance rape situation accepts the fact that she is not going to be able to prevent her attacker from having intercourse. If her attacker has forcibly expressed his intentions, she has reasonably manifested her lack of consent to this point, and the act of intercourse is consummated immediately thereafter, does the law require more? Under the "totality of the circumstances" in the record before us, I am convinced beyond a reasonable doubt that the accused was guilty of rape.

BAUM, Chief Judge (concurring in part, dissenting in part).

I concur with Judge Edwards' opinion except for the factual conclusion concerning rape and the action with respect to the sentence. As pointed out by Judge Edwards, our responsibilities under Article 66, UCMJ, require each judge to be convinced beyond a reasonable doubt of guilt before a conviction may be affirmed. After weighing the evidence in the record and making allowances for not having observed the witnesses personally, I am not convinced beyond a reasonable doubt that certain essential elements of rape have been proven.

Force and lack of consent are necessary to establish this crime. Incorporated into the Uniform Code of Military Justice at the outset, these statutory elements have not been modified. Societal changes and case decisions may have prompted differing views on how these elements are manifested, but they still must be proven beyond a reasonable doubt in order to convict a person of the military offense of rape.

The new concepts of "date rape" and "acquaintance rape," as described by Judge Edwards, have had their effect on various state legislatures and courts, but the Uniform Code of Military Justice remains

unaffected by these latest civilian developments. Helpful as the state opinions on this subject seem to be to my brothers, I find them inapt until such time as Congress sees fit to modify the Uniform Code of Military Justice in the same manner as the states.

Various degrees of seriousness could be provided for in the Uniform Code of Military Justice with lowered proof requirements for the less serious sexual crimes, particularly with regard to proof of force and physical resistance. Until those amendments are made, however, rape, with a statutorily authorized penalty of death, continues to be an offense that can be treated as seriously as first degree murder. I do not believe the accused is guilty of a crime of that magnitude.

The relatively light sentence adjudged by the court members appears to reflect the same view. They, nevertheless, convicted Appellant of rape after hearing evidence that during the period leading up to the act of penetration, the alleged victim did not attempt to hit or otherwise physically repel Appellant, did not scream, and did not attempt to flee. Moreover, Appellant made no threats of any kind and Petty Officer T was never afraid that he might harm her. There was also evidence that on a subsequent occasion, under almost identical circumstances, Petty Officer T, by demonstrating her will not to have intercourse with Appellant, was able to walk him to the kitchen and out the door.

The Manual for Courts–Martial, 1984 provides that:

If a woman in possession of her mental and physical faculties fails to make her lack of consent reasonably manifest by taking such measures of resistance as are called for by the circumstances, the inference may be drawn that she did consent. Consent, however, may not be inferred if resistance would have been futile, where resistance is overcome by threats of death or great bodily harm, or where the female is unable to resist because of the lack of mental or physical faculties. In such a case there is no consent and the force involved in penetration will suffice. All the surrounding circumstances are to be considered in determining whether a woman gave her consent, or whether she failed or ceased to resist only because of a reasonable fear of death or grievous bodily harm.

Paragraph 45c(1)(b), Part IV, Manual for Courts–Martial, 1984.

The Manual provision discusses resistance only in terms of its reflecting consent or non-consent. The case of *U.S. v. Bonano–Torres*, 31 M.J. 175 (C.M.A.1990), ties resistance also to the question of force. The Court of Military Appeals made it clear in that case that it had no disagreement with the Army Court of Military Review's legal conclusion that, "resistance is central to finding the element of force." *Id.* at 178. The Court also found no legal error in the Army Court's refusal to apply the doctrine of constructive force, upon its finding as fact that the alleged victim was both physically and psychologically capable of resisting the accused's sexual advances, that the accused did not use threats of bodily harm, and that the circumstances were not otherwise such that resistance would be futile. *Id.* at 179–180.

Applying the principles from the Manual for Courts–Martial and *U.S. v. Bonano–Torres, supra,* to the evidence of record, I find factually, first, that the requisite element of force has not been proven beyond a reasonable doubt. Secondly, on the question of consent, I find that, notwithstanding Petty Officer T's verbal protestations, she did not physically resist Appellant's advances, once she found herself sitting on the kitchen counter.

In possession of her mental and physical faculties, Petty Officer T failed, in my view, to take such measures as were called for under the circumstances to make her lack of consent reasonably manifest. Moreover, her failure to resist was not because of a fear of death or grievous bodily harm.

I infer from these facts that at some point Petty Officer T consented to the act of intercourse, either because she changed her mind or because she simply wanted to get rid of Appellant, in the same manner as

the alleged victim in *U.S. v. Bonano–Torres*. In either event, the finding of guilty may not be affirmed.

My conclusions are reinforced by the evidence that on a subsequent occasion Petty Officer T was capable of foreclosing Appellant's advances. Failure to take similar steps on the night of the alleged rape confirms my assessment of the facts. I would set aside the finding of guilty of rape and dismiss that offense. I concur with Judge Edwards with respect to the remaining offenses, but I would return the record for a rehearing on sentence in view of the dismissal of the four orders violations and of the rape offense.

## APPENDIX A

**U.S. Department of Transportation**

Office of the Secretary
of Transportation

# Memorandum

---

Subject: APPOINTMENT OF APPELLATE MILITARY JUDGES TO THE COAST GUARD COURT OF MILITARY REVIEW

From: The Secretary

Date: January 15, 1993

Reply to Attn. of:

To. Chief Judge, U.S. Coast Guard Court of Military Review

1. The assignment of appellate military judges to the Coast Guard Court of Military Review, as reflected in the General Counsel's memo of April 20, 1992, is adopted this date as judicial appointments of my own. Those judges presently assigned and appointed by me are:

> Chief Judge
> Joseph H. Baum
>
> Judges
> Alfred F. Bridgman, Jr.
> Michael C. Grace
> John A. Bastek
> Terrance M. Edwards

The judicial duties and powers of these judges will be as prescribed under the Uniform Code of Military Justice.

APPENDIX B

U.S. Department
of Transportation

United States
Coast Guard

# Memorandum

**Subject:** STATUS OF COAST GUARD COURT OF MILITARY REVIEW AND PREVIOUSLY DECIDED CASES IN LIGHT OF *U.S. V. WEISS* **Date:** 8 January 1993

**From:** Chief Judge, Coast Guard Court of Military Review

**Reply to:** G-L-3
**Attn. of:** BAUM; 7-0045

**To:** Chief Counsel

1. As I indicated yesterday, all the judges on the Coast Guard Court of Military Review are in agreement as to the potential effect of *U.S. v. Weiss*, ___ M.J. ___ (C.M.A. Dkt. No. 67,869 December 21, 1992) on the Court and on cases already decided that are not final. Our conclusions are:

 A. When the first Coast Guard case with the Appointments Clause issue is decided by the U.S. Court of Military Appeals, four judges will hold that the Constitution's Appointments Clause applies to appointment of court of military review judges and that the General Counsel's assignment of civilians to the Coast Guard Court of Military Review, as Judge Advocate General, while comporting with Article 66, Uniform Code of Military Justice (UCMJ), violates the Constitution i.e., that portion of Article 66 which purports to authorize assignment of civilians to a court of military review by the Judge Advocate General is unconstitutional. The views of the four Court of Military Appeals judges on this matter have already been made clear in *U.S. v. Weiss, supra*, a Navy-Marine Court of Military Review case with the Appointments Clause issue, but not involving any civilian judges--only active duty commissioned officers. The positions of those judges are as follows:

 (1) Chief Judge Sullivan and Judge Wiss have stated that the terms of the Appointments Clause must be met when court of military review judges are appointed and that those terms are not satisfied by the Judge Advocate General's appointment of court of military review judges, military or civilian.

 (2) Judge Gierke, with Judge Cox concurring without comment, holds that the appointment of court of military review judges must comport with the Constitution's Appointments Clause and that assignment of active duty commissioned officers to a court of military review by the Judge Advocate

General does not violate the Constitution's
Appointments Clause because all commissioned
officers are appointed by the President in accord
with the Constitution and that "appellate military
judges need not be reappointed to perform judicial
duties because judicial duties are 'germane' to the
offices already held by them as legally trained
commissioned officers of their respective armed
forces." *U.S. v. Weiss, supra,* slip op. at 27.
This rationale, of course, does not apply to
civilians. Judge Gierke, with Judge Cox concurring,
has sent the following clear signal that civilian
appointments by the Judge Advocate General will be
held unconstitutional:

> In appellant's case we need not decide
> whether Congress inadvertently exceeded their
> authority by vesting the powers of an "Officer
> of the United States" in civilians who had not
> been appointed in accordance with the
> Appointments Clause, because no civilians
> participated in the appellate review of his
> case. We regard the provision for civilian
> members of boards of review and their
> successors, the courts of military review, as
> severable from the remainder of Article 66(a).
> Congress had two purposes in enacting Article
> 66(a). The primary purpose was to make boards
> of review mandatory for all services. The
> secondary purpose was to accommodate the Coast
> Guard by authorizing civilian members on boards
> of review. Where a statute attempts to
> accomplish two or more objects, it may be valid
> as to one and invalid as to others, so long as
> its purpose can be accomplished by the valid
> part and is not dependent upon or conditioned
> by the invalid part. *Sutherland Stat. Const.* §
> 44.07 at 503-04 (4th Ed. 1986 Revision).

*U.S. v. Weiss, supra,* slip op. at 26-27.

B. Given the expected Court of Military Appeals holding
with respect to civilian judges, the assignment of both
Judge Bridgman and myself to the Coast Guard Court of
Military Review by the General Counsel will be declared
constitutionally invalid, since we are civilian Coast
Guard attorneys, unless both Judge Gierke and Judge Cox
adopt the views expressed in *U.S. v. Kovac,* 36 M.J. 521

(C.G.C.M.R. 1992) that Judge Bridgman and I, as retired commissioned officers, fall within the rationale expressed in *U.S. v. Weiss, supra,* and do not need to be reappointed. If both Judges Gierke and Cox reach that conclusion, our Court, as presently constituted, will be upheld because Judge Crawford, who finds the Constitution's Appointments Clause inapplicable, will concur in the result. On the other hand, if either Judge Cox or Judge Gierke concludes that retired commissioned officers fall outside the *Weiss* rationale, a three-judge majority--Chief Judge Sullivan, Judge Wiss and either Judge Gierke or Judge Cox--will disqualify Judge Bridgman and myself. We are not particularly sanguine about the prospects of the *Kovac* view being adopted because to date there has been no indication that there will be vigorous appellate advocacy of this position. To our knowledge, no supplemental briefs have been filed strongly advancing this position with the Court of Military Appeals nor has oral argument been requested by the Government in any of the Coast Guard cases. In fact, it is our understanding that the *Weiss* decision has not prompted the filing of any briefs with the Court of Military Appeals or requests for leave to file supplemental pleadings in light of that opinion.

C. If the Court of Military Appeals decision on this matter is adverse to the Coast Guard, there are at least 17 cases that have been decided by the Coast Guard Court of Military Review that will be directly affected, without a ruling of retroactive applicability. Those 17 cases, which are not final under Article 76, UCMJ, are three-judge panel decisions in which I participated. *U.S. v. Elliott,* 15 M.J. 347 (C.M.A. 1983) held that a panel cannot lawfully operate during a time when it has less than three members. Accordingly, at a minimum, those 17 Coast Guard Court of Military Review decisions will be invalidated and the record returned for another review by this Court. Our Court at that point will be composed of three active duty commissioned officers with other primary duties, who, without devoting full-time to Court work, will be hard pressed to meet their Article 66, UCMJ responsibilities along with their other duties.

D. For these reasons, all the judges on this Court believe it is imperative that the Secretary of Transportation, in his capacity as a cabinet level head of department, reappoint the present judges to their judicial offices immediately so that they will be able to

STATUS OF COAST GUARD COURT OF MILITARY 8 January 1993
REVIEW AND PREVIOUSLY DECIDED CASES IN
LIGHT OF *U.S. V. WEISS*

 handle the current and future Coast Guard docket as a
court constitutionally valid beyond any doubt. The
attached memo will accomplish that result pursuant to the
Secretary's Congressionally authorized appointment
authority under 49 U.S.C. § 323(a), which states: "The
Secretary of Transportation may appoint and fix the pay
of officers and employees of the Department of
Transportation and may prescribe their duties and
powers." The Secretary's action will thus meet the
requirements of that portion of Article II, § 2, cl. 2 of
the Constitution which states: "the Congress may by Law
vest the Appointment of such inferior Officers, as they
think proper, in the President alone, in the Courts of
Law, or in the Heads of Departments." No advice and
consent of the Senate is required. .

2. If Secretary Card does not sign this memo before he leaves
office, we contemplate that there will be an extended staffing
period before the new Secretary is prepared to take such
action. In that event, if the Court of Military Appeals
decision is adverse, as expected, the work of this Court will
be brought to a standstill.

 J. H. BAUM

Encl: (1) Secretary, Department of Transportation Memo

**U.S. Department of
Transportation**

Office of the Secretary
of Transportation

# Memorandum

Subject: APPOINTMENT OF APPELLATE MILITARY JUDGES
TO THE COAST GUARD COURT OF MILITARY Date:
REVIEW

From: The Secretary Reply to
Attn. of:

To: Chief Judge, U.S. Coast Guard Court of Military Review

1. The assignment of appellate military judges to the
Coast Guard Court of Military Review, as reflected in the
General Counsel's memo of April 20, 1992, is adopted this date
as judicial appointments of my own. Those judges presently
assigned and appointed by me are:

Chief Judge
Joseph H. Baum

Judges
Alfred F. Bridgman, Jr.
Michael C. Grace
John A. Bastek
Terrance M. Edwards

The judicial duties and powers of these judges will be as
prescribed under the Uniform Code of Military Justice.